Case No. 14-5284, Defenders of Wildlife and Center for Biological Diversity Appellants v. Sally Jewell et al. Mr. Rylander for the appellants, Mr. Toth for the appellees. I'm a migrant. Migrant. Migrant. Good morning, and may it please the court. My name is Jason Rylander. I represent Defenders of Wildlife and the Center for Biological Diversity in this action. With me at council table is Mike Senatore and Karima Schoenhut from my office. With the court's permission, I'm going to try to reserve about two minutes for rebuttal. The dune sagebrush lizard has lost more than 80 percent of its irreplaceable Shinnery Oak dune habitat. It has been a candidate for listing for more than 30 years. Fish and Wildlife Service proposed listing it as endangered in 2010 because it faced immediate and significant threats to its rare habitat from oil and gas development, ranching, and herbicide use. In 2012, the service denied the rare lizard federal protection based fundamentally on a secretive, unenforceable Texas plan that was cobbled together at the last minute. The service's own policy sets an extraordinarily high bar for evaluating voluntary conservation efforts. Under the Policy on the Evaluation of Conservation Efforts, or PEACE, as it is sometimes called, an effort must be highly certain to be implemented and effective. Policy states that the service needs to be certain that the effort improves the status of the species at the time it makes the listing determination. To that end, the service must demonstrate that the efforts will be carried out, when they will be carried out, and whether they will be effective in eliminating threats to the species. These last-minute agreements generally should not affect the listing decision. Even if it's a good one? I'm sorry, Your Honor? Well... Yes, well, if it's a good one, if they can show that it's highly likely to be certain... Yes, that's my point. Yes, well, and then... The fact it's last minute doesn't get you too far. Yeah, I mean, we haven't challenged the PEACE policy directly. They can take into account one that actually eliminates threats to the lizard, but this one does not. And our brief highlights many reasons why. But today I'd like to focus on a couple of reasons why the Texas plan is unlike any other conservation agreement the service has evaluated before or since. First, it was irrational for the service to conclude that enrollment would continue to increase after the incentive of threat of listing was removed. Second, the Texas plan's unprecedented secrecy provisions undermine any claim that it is certain to be implemented and effective. And third, based on the policy itself and the amount of habitat that was enrolled at the time of the decision, it is clear that habitat loss and fragmentation is still likely to occur, because there is no meaningful cap on habitat loss and fragmentation that will save the lizard. The service is completely in the dark on who has enrolled, what kinds of lands have been enrolled, and the terms and conditions of enrollment. The plan lacks meaningful curves on development, and the service cannot directly monitor or Most of all, participants can drop out at any time. The plan represents the kind of future speculative efforts that numerous courts and the service's own policy reject. In fact, the preamble warns against this very situation where a last-minute uncertain agreement is relied upon to affect the listing. As for whether this plan was not certain to be highly certain to be implemented, it was irrational, wishful thinking on the part of the service that enrollment would continue to increase after listing was removed. It was inevitable, based on this record, that enrollment would go down, and in fact it has. The threat of listing is no longer meaningful after a withdrawal decision was made. It's taken more than 28 years to propose listing if the service would go down. We always know there could be relisting, though. There can be relisting. If the enrollment goes down, if the plan's not working, the people know, the affected people know there could be relisting. The service could emergency list the species if the plan is not working, and in fact the service should be doing that now because the evidence shows that the, I don't want to get too far beyond the record, but the plan is not working. I just don't understand why the threat's not still there. Because they would have to begin again with a new listing decision, and it's really a temporal issue. There are many other species that are awaiting listing. A new listing petition, for example, would require a new proposed rule, no notice and comment, and it simply wouldn't take place in the ordinary course of events in a short enough period of time. Meanwhile, with insufficient number of participants in this plan, there's a competitive advantage to actually not comply with it because some operators are not involved in the plan, and those that are may be at some sort of a disadvantage. So, again, it's just not reasonable to think that, given the way the service runs its listing policy, and we all admit that it doesn't have the resources, to think that that threat is meaningful. Another example, I mean, in New Mexico... But could I just be clear, you said the service should be doing an emergency relisting now. So that means it can stop everything tomorrow? Well, the service has within... I just want to understand the process that you contemplated with emergency listing. Well, yeah. What should happen is that this decision, based on the record itself, should be remanded to the service to re-evaluate because the piece analysis is faulty and it didn't comply. So I wasn't clear. You're concerned about the time that a relisting with a rulemaking, notice and comment, and all that entails. An emergency relisting cuts out a lot of that time, doesn't it? It cuts out all that time initially. The service then has 240 days to re-propose listing and go through another process, but it does have within its authority the ability to list the species right away. It's not doing that, even though we know that the plan is failing. So I have no reason to believe that the service is going to list a lizard in oil country at this time when it did not, based on the record that's before the court. And how is a dune complex defined? Oh, that's a good question. So... In other words, is it a huge area or is it defined in another way? Well, I think maybe the best way to explain that, in the J at 701, there is a map that looks something like this. And the one in the J.A. is not in color, but I'm happy to provide it in color if the court would like. But this shows the extent of Texas habitat. And as you can see, it's extremely fragmented. It's color-coded based on an overlay of where they have found lizards on top of an assessment of general habitat quality. When the service talks about polygons, this is what it's talking about, these little blobs on the map. And within that, the service does not know and cannot know, under the secrecy provisions of the Texas plan, exactly where habitat disturbance is occurring and whether habitat impacts are cutting off large quantities of habitat that the service thinks it needs. I'm on page 701 with you. Yes. What is a dune complex? So a complex would include both the Shinnerio trees or bushes, however you want to put it, with all of the root systems and then the blowouts that go around it. In other words, how if I'm in the controller's office and I'm supposed to file this report, what am I filing a report on in terms of this dune complex? Am I looking at the whole state of Texas, or what am I looking at? Well, they're looking at just these areas that have been enrolled. And then they're saying, essentially, that within- So what you have on 701 is a dune complex? Well, no, I think there are many dune complexes within each of those- And how do you define those dune complexes? I'm actually not entirely sure. All right, so I'll ask the government so they can be prepared to tell me how to understand what the reporting requirement entails. But what I do know, within these circles, however many complexes they're making out here, they're only reporting to the service direct habitat impacts. So if you have- I know, but if it's one thing, it's a couple of blocks. Another thing, if it's a couple of miles, a couple of counties, half the state, I mean, what are we talking about? Well, so this is a county. That's another county. That's another county. So I think we're really talking about actual individual vegetation within these maps. All right, I'll ask the government. What about the 1% cap? How do we factor that into the analysis? So the 1% cap, we have a core disagreement both with the goal and also with the certainty that it will be achieved. As for the goal, and it's really a 10% cap over the course of the plan, that was designed according to the Texas plan in JA 493, it was designed to facilitate uninterrupted development in the Permian Basin. It locks into place expected habitat loss based on a projection of the amount of oil and gas development that the service believed would occur. It is not, and the service never made a determination that that was the exact amount of habitat loss on top of the 80-plus percent of habitat already lost that the lizard can sustain going forward. Essentially, this locks in existing trends, and the service never explains why that is correct. But our biggest concern, aside from that scientific point, is that it can't be met in any event because at the time that the decision was made, more than 30% of Texas habitat was never enrolled in the first place. So it's mathematically impossible for the service to state that 1% loss of habitat in 3 years or 10% over 30 years will be achieved. Landowners can quit at any time, and some have. The service never says what level of enrollment is actually required for the plan to work. Well, it had 71%, right? It did. It had 71% of... It had the experience of the New Mexico plan to look at historically. The New Mexico plan is a very different plan for a number of reasons. For one thing, it has complete transparency. I know. It doesn't have the secrecy. I understand that. But that doesn't affect the bottom line number necessarily, does it? It does in the sense that the next plan also covers the lesser prairie chicken, which the service had proposed to list and, in fact, did list last year. So there's a lot more incentives for people to stay in the New Mexico plan to cover more than one species. It also directly... People who sign up for that plan of inclusion directly steer you out of blizzard habitat. That's the promise you're making. They can still drop out of the New Mexico plan, but there's a lot less reason to do so. So the service didn't, in our view, have... And I think some of the scientists in the record actually indicated that once the threat of listing went away in Texas, there was no incentive. Staff also indicated that of the most high-value habitats, some 90% to 100% of it should have been enrolled at the time of listing, and it wasn't. So our concern is that the cap really is illusory and that because of that, because there are so many questions about it, under the service's own standard, it could not have been highly certain to be effective, given that ongoing and future habitat loss and fragmentation remained a threat. And the service doesn't even know how much habitat can be lost without impacting the species. So part of the response, as I understand it, is that the focus of the plan is on avoidance and mitigation, so that if there is destruction above 1% in the 3 years and 10% over the 30 years, that will be either avoided, and if not avoided, mitigated, and that you end up with a basic core habitat that is preserved. Well, the plan actually requires that there be a positive biological effect. The piece requires that, and the plan itself states that mitigation is supposed to take place before any habitat is lost. But subject to these points I made that are in the plan. So why isn't that a good response? Because new habitat cannot be created. Landowners do not have to engage in any particular mitigation. They can make a determination about whether it's economically feasible to do so. They're not actually required to steer out of lizard habitat, and they're not actually required to show that there's been any positive benefit to the lizard prior to engaging in any type of habitat destruction. I'm into my rebuttal time. Let me just understand. I know you talk about prior to destruction, but if there is destruction, I thought the response was, well, there are these mitigation requirements. Well, again, I think the mitigation requirements do not necessarily kick in. I mean, they're not requirements. The landowner can decide what it is that they want to do, and the service doesn't know on any given certificate of inclusion what has been agreed to. So when you read through the withdrawal decision, it's a little bit schizophrenic. What do you mean the service? Here, the controller will know. Won't he or she? The controller may know, but it's up to the service at the end of the day to determine whether this plan is working. And if it's only getting aggregate reports, it has no idea what's actually taking place on the landscape. I understand you don't like the delegation here, but I just want to understand how it works. As I understand, the controller is going to know the details of each enrollee's certificate of inclusion. The controller has the details of the certificate of inclusion. That is correct. So the controller will know what's going on. But the certificates of inclusion, at least the one or two that they revealed, indicate that there is nothing binding on the landowners. The controller may know what's going on and what has been done, but at the end of the day will only report to the service the amount of destruction that has taken place and whether there's been any mitigation without any real analysis of whether there's been any positive biological effect or what impact that's had on the lizard. How do you know the latter? Well, we have to look at the reports that have been filed, but they're not very detailed. Let me ask you something and tell me why I'm wrong, and I may be wrong. Keeping in mind that the Endangered Species Act says that an endangered species becomes so if it's in danger of extinction throughout all or a significant portion. Now, my understanding is most of these lizards are in New Mexico, and most of the territory in New Mexico, 54% of it at the time of the withdrawal, was being managed by the Bureau of Land Management. So you've got, I'm not sure what the numbers are. I thought it was something in 70% of these lizards are in New Mexico. You don't seem to have a problem with New Mexico, and even half of New Mexico, or maybe I'm mixing up the percentages, is being regulated by a federal agency, the BLM. And so we've got this little bit over in Texas of, what, 20% of these lizards. And why isn't that good enough? Sure. Because the service said it wasn't, is the right answer. In the proposed rule, they already have the New Mexico plan and the BLM plan, and they found that the protections need to be in place in Texas. Even after they re-evaluated the BLM regional land management plans and found it to be an adequate regulatory mechanism, they still spent the entire time of the administrative record working feverishly with the state of Texas to put a plan together. They then went ahead and determined at their last full staff meeting that the lizard should be endangered without a Texas plan. It's a three-legged stool. This is in 2010? I'm sorry? This is in 2010? In 2010 was the proposed rule. In 2012 was the final withdrawal decision. And when your answer to Judge Henderson's question was because the service said it's not good enough, and are you referring to its statements in 2010? I'm referring to its statements in 2010, its statements in the record of JA 484 when they concluded that without a Texas plan, and also in the final decision itself, which relies very, very heavily throughout the decision on the alleged protections in the Texas plan. It's a three-legged stool. So if you find that either the Texas plan violates the peace, then the case should be remanded. And on the second hand, setting the peace aside, if you find that there are still sufficient threats to the lizard under the five factors, then again the case should be remanded to the service. Why can't the agency look at the BLM peace, the New Mexico agreement, and the Texas plan together, and then on the Texas plan look at the cap, look at the number of enrollees, look at the history of the experience in New Mexico to inform how things are likely to develop, all with the threat of relisting if things aren't working out as being sufficient for now to deal with the problem? Well, for the reasons that we stated in the briefing that we talked about a bit this morning, we don't think that it was reasonable for them to assume that enrollment would continue. The details of the Texas plan itself are highly uncertain. Large amounts of habitat were not. There are benefits from enrollment, though. There are always benefits to these sorts of plans, but the services standard that it set for itself is that it must be highly certain to be implemented and effective in the first instance. And then when it looks at the five factors under the ESA, it must conclude that either there are no threats to the lizard and therefore no adequate regulatory mechanisms needed, or that there are threats and that they're sufficiently dealt with. It could have also chosen to list the lizards threatened instead of endangered, recognizing that continued habitat loss in the foreseeable future could lead to an endangered state. But on remand, if the service wants to go back and try to make the assertion that the Texas land is not necessary for the lizard's survival, it can do that. But this record throughout, from the proposed rule straight through to the final decision, relies very heavily on the efforts in Texas. All right. Thank you. We'll give you some time in reply. Thank you so much. Mr. Todd. May it please the Court. The Endangered Species Act requires the Fish and Wildlife Service to make these types of determinations about whether to list endangered species. After taking into account any conservation efforts by a state to protect a species, and that's through other conservation practices, that's in the statute at Section 4B1A. What this case is essentially about is a challenge to the manner in which the service undertook that obligation and considered the voluntary efforts of the Texas comptroller in the Texas Conservation Plan. And I want to emphasize that the challenge here is fairly narrow, as you all recognize the amount of habitat in Texas for the lizard is a quarter to a third, approximately, of the overall habitat for the lizard. And the habitat, the approximate two-thirds of the habitat that's in New Mexico, 95% of it is protected either by the BLM's Land Management Plan or by the New Mexico Conservation Agreement, or it has been withdrawn, its public lands that BLM has withdrawn from leasing altogether. So those protections assure the lizard's status in New Mexico, and they're not disputed here in any meaningful way. That's just to set a little bit of a context for the plaintiff's challenge. So one of the things they're worried about are the enrollment numbers will decline. So if their theory is true, that any time a species is determined not to be listed, not to be endangered, that will remove the incentives for these voluntary conservation plans, and enrollment will drop. That means that the voluntary conservation plans will never matter to a no-list decision. Essentially, they will always require the service to list. Otherwise, that incentive, according to their theory, will not remain. But in fact, as your Honor pointed out, there is the possibility of emergency listing. There is the possibility that they could re-petition, and yes, the service has been pressed with resources over the years. Plaintiffs certainly know how to get in line and litigate a deadline suit and obtain a favorable settlement that puts the service on a track to making another decision over a set time frame. And they've done so with consent decrees and the like, giving court deadlines. They also say the cap won't work. So can you respond to that, the 1 percent cap issue? So the cap is to be re-evaluated at three years, and three years past this past spring. So there's a lot of post-record information, and I think my friend is relying on some of it unfairly. It is post-record, the implementation of the plan. But being at the three-year mark, the service said it would look at whether the cap has been reached. And if it had not, or if it had, then it would then evaluate whether additional lands, up to 10 percent of the habitat over the 30-year life of the plan, could be allowed to be disturbed. So that's how the cap works. There's regular reporting. There is, for the first three years, monthly reporting by the comptroller to the service. And the details of those reports or the topics are in the Texas plan at JA629. It lists the items that are going to be in those reports. I'm not sure that any of them are in the record because they are post-decisional. But the service reported the amount of habitat that, if any, that would be, that was disturbed over the prior time period, the amount of mitigation undertaken, and any enforcement issues and how those were dealt with, noncompliance. And it is fundamentally Texas' plan and the comptroller's plan. And so in this situation, the comptroller is the primary line of authority charged with enforcing the terms of the plan. And as Judge Rogers, you pointed out, the comptroller does have access to all that private data. Well, I'm not sure that's true. When you look at the Texas statute, it reaches state agencies as well as federal agencies. So that's just a question of reading the statute. But what is a DUNE complex? So the best source I can point you to is on JA702. It's the page after the map that my friend pointed out. The DUNEs are described as expanses of the same geologic DUNE formation that are identified from aerial photography. So what does that mean in practical terms? So it's a geologic feature. No, I understand it. But the point is when you look at this map, what information is the service receiving? So there are a number of these. I believe they don't have numbers on them in this map, but I believe each of these different, and they are colored in a colored version, colored shapes is a separate habitat area based on the geology that's been determined from the aerial photography, based on the vegetation that's there. And so those are numbered. Those different shapes are numbered. And what's reported by acreage, by each separately numbered shape, is the acreage, if any, that was disturbed during that time, and the acreage, if any, that mitigation activities were undertaken at that time. So I'm the controller, and I'm trying to figure out what to report. What am I reporting? So you have a list of these different shapes. I've got them. Right. And you've got all the different plan participants who have entered into individual agreements with the controller about what activities are going to undertake on their lands. So looking at this map, and I'm the controller's office, am I reporting on the Andrews area? Am I reporting on the Hector area? All of it. So I'm reporting on everything on 701? That's my understanding. So if I'm the Fish and Wildlife Service, what I get is, because I don't understand this exactly, a fat number. All right? And it says habitat is down by 0.5%. Then what happens? So it would look at where that habitat is located, and it could determine based on what shape on the map, because it is coded to the particular shape. So you say that the Fish and Wildlife Service can do that? Correct. All it has, according to what you're telling me, is a report on this entire geographic area. That's 0.5% habitat down. Perhaps I misspoke. They have a report on each different shape here. You can see, unfortunately, this isn't in color. Could you supply us a color copy? Yes, I will do that this afternoon. Okay. And the different colored shapes are separately numbered, and so you get dune complex number 1 had 0 acres disturbance. Dune complex number 13 had 0.3 acres disturbance. So who is making up these colors? This came from a scientific paper from 2011 from a scientific researcher, Hibitz. And it was identified based on the likelihood that each of these different habitat areas is going to be occupied by the lizard. And they determined that based on the type of plant life that's there. They had the shinery oak plants there, and also based on the geology, if it was a dune that had the types of—they called them blowouts. These eroded areas on, I guess, the leeward side of the dune where there's a hollow that the lizard can— So you're satisfied that the controller and the Fish and Wildlife Service understand what information is going to be obtained? Yes. I mean, this is a regular working relationship that they have where they have these monthly reports. They have regular meetings. It's supposed to be a cooperative adaptive management framework. So the service could say, we look at what I'm going to assume is a red area showing it's very high. And while this whole area is down by 0.5 percent, can the Fish and Wildlife Service say to the controller, you have to do more in this red area? They could. Respectfully, you have the colors reversed. When you see the map, it will be the dark green that has the higher likelihood, but yes. What I'm going to cite, what I'm talking about is categories of occurrence very high, whatever color that is. Correct. Can the Fish and Wildlife Service say to the controller, do better? So that's part of this reevaluation at the three-year mark. The idea of the one-year cap was that would be the way, the metric by which the service could say whether there needed to be something done better or not. One of the points that my friend has made about this reporting is that it's not on a parcel-by-parcel basis. It's not clear to me what it is on. That's what I'm trying to define. Yes. It's based on habitat. I know where these trees are. Where the trees are. And the trees have roots that cover 200 miles. Underground. I know, but that's a good habitat. Yes. And so what they've found is that it's a combination of the oak trees being above the surface and being on these particular geologic formations, these dunes that have these particular I'm with you, but I'm just trying to understand. The Fish and Wildlife Service has, approving this plan, the controller's office, which as I understand is the financial office, has a responsibility of getting these certificates of inclusion or has it turned it over to Texas A&M to do that? And Texas A&M has turned it over to this foundation. Yes. So it's the foundation that's the working body here? I don't know all the details. That arrangement is my understanding as well. And so I think they do the reporting, and I think you're correct that they are doing the on-the-ground work. So just hypothetically, if the service gets a report that says habitat in the first three years is down by 11%, what happens? In the first three years, 11% would be exceeding the cap. So they would have found out about that presumably well before the three-year mark and would have adjusted the plan through their adaptive management process to further restrict. Who is the they in your sense? Okay, the Fish and Wildlife Service would have been meeting with the controller and would have under the terms of the permit that the Fish and Wildlife Service granted Texas based on this plan would have sought to modify the terms of the permit to be more strict about what Texas is allowing to occur. So let me be clear. I'm a controller, and the service has given me a permit, and it understands this construct that I've just gone through. Where does it get the authority to modify the permit? So the permit's issued under Section 10A1 of the Endangered Species Act. It's called the Enhancement of Survival Permit. Right. It's based on this plan, and there is a set of regulations that the Fish and Wildlife Service has that governs these types of permits that provide a revocation procedure. All right, so then the service has to bring a revocation or a modification proceeding against the controller? So that would be a last resort after all the discussions on all that, but ultimately, yes. Let's assume the discussions get nowhere. So in the worst-case scenario, the option for the service would be to revoke that permit, and what it would do is terminate the assurances that all these landowners have. If you get that far. But would the service be able to pinpoint this red area in the reporting materials it receives? And you're telling me yes. It would. It would be at the level of the habitat, but not at the level necessarily of the individual landowner. I understand that. Okay. But we're talking about the dune complex. Yes. And this could be a 200-acre area. Yes. But potentially. I don't know the exact. I think it's probably smaller than that, but potentially. Well, I mean, I'm trying to find out what we're talking about. Yes. All right, and you point me to a map that is huge, and you cannot tell me how huge or small this very high area is. I can get it. But you're assuring me that, or are you, that the service will have information as to whether the problem, the 11 percent problem, is in this very high area or in a very low area. I believe it does. Yes, I believe it. Then it's up to the comptroller's office or this foundation to take some action against whoever it is who signed this certificate of enrollment. That's my understanding, yes. The comptroller has the enforcement responsibility against the landowner. So I own some land, and I'm burning my land, and, of course, this is destroying the roots. So what happens now? So if you're enrolled in the plan. I'm enrolled. And that's something that sounds like you're hypothetically removing the habitat. I'm destroying the habitat. I'm guessing that's going to be prohibited, whatever the landowner does. I'm with you. So what happens? I'm trying to give you the worst-case scenario so I understand how this protection is enforced. So the comptroller would go to the landowner. And say, we're not happy with what you're doing. And we're going to revoke your certificate of inclusion in the program, which means from this date forward you will not receive assurances that if the lizard is listed, what you're doing on the land will be, you'll be not cited for incidental take. That's assuming the comptroller has my name. He may know my Lawton Square number that's a public record somewhere, and then he can trace me. But that's what has to happen. Right. And I think, I will go back and take a look at that statute again, but I think it, you know, it says may not be disclosed to any person, including a state or federal agency. It's talking about information that's submitted to the comptroller. So I think it's like with the. . . But at any rate, you're saying that the Fish and Wildlife Service is satisfied that it can get the information it needs. And I'm just trying to understand why it is satisfied. So it gets the reports by habitat complex, by the particular dunes that it knows based on the map, have a particular likelihood of the lizard occurring there. It knows what acreage has been disturbed, if any, in those particular areas. And it also knows the overall sum of the acreage that's been disturbed over the life of the plan, month by month. So it can. . . So I'm clear. It can negotiate with the controller to do something about it. And if the controller doesn't do anything, then the service can revoke the permit. Correct. And the permit is in the record. It's at JA802, I believe. . . 803 and following. And that's the Enhancement of Survival Permit. Yeah. We haven't talked a whole lot about that, but that is premised on this whole plan that was developed by Texas. So if the plan is not getting implemented in a way that is protective of the lizard, and if, in a really worst-case scenario, if it were doing detriment to the lizard, then certainly it would be the Fish and Wildlife Service's responsibility under the terms of this permit to go in and issue an order to show cause why it shouldn't be revoked, and ultimately, after giving Texas an opportunity to respond, could revoke the permit. The likelihood. . . Go ahead. The plan is in effect. The plan has been in effect, yes, since February of 2012, when the service signed this permit. So, you know, the decision was in June of 2012. So although this policy on evaluating conservation efforts is often talked about as applying to future conservation plans, this is something that was on the ground and operating at the time the service did make its decision. I'm past time. Do you have any more questions, Judge Rogers? No, but just trying to think for a moment. I have one question about split ownership concerns. Yes. Is it your understanding that under the plan, because any enrollee, if the surface owner doesn't enroll, then is the subsurface owner off the hook? I think the answer is yes. If the surface owner enrolls, is the subsurface owner bound in some way by that enrollment? In other words, if I own the property and you want to extract minerals. . . Right. You have to get my permission, don't you, to extract on my property. Right. So if I enroll, that indirectly enrolls you? I don't know if as a legal matter that's true. That's what I'm trying to figure out. I don't think as a legal matter that the enrollment of the surface owner, as a matter of law, enrolls the mineral estate owner. The mineral estate owner is going to have some, under state law presumably, some reasonable right to access the minerals in a way that doesn't waste the surface. What really, I think, confuses this issue of surface versus mineral estate is we're talking about activities related to the lizard's habitat that all occur on the surface. It's either going to be mining and the placement of well pads or drilling. It's all talking about how it impacts the shinery oak dunes on the surface. So if the land is primarily being used for oil and gas leasing at the present time, it makes most sense to have the oil and gas operator agreeing to some voluntary terms about where to place the well pads, consolidating infrastructure, and the like. And that's going to be what's most important to the conservation needs of the lizard. Now, if the fee owner, when they come back into possession of that area, wants to go and remove all the shinery oak dune with herbicide and it's not enrolled in the plan, then they're going to have to look to state law to see if there are provisions there that would prohibit that person from doing that. But really it's focused on the activity that's most important for the lizard, and in many cases that's going to be one or the other but not both. And could I be clear too, at the time of approval of the plan, or at the time, I guess the relevant time is the withdrawal of the proposed rule to list, is the so-called core habitat area in Texas covered by certificates of inclusion? So I don't know that that's... In other words, in the record it says that the area in Texas is not a fragmented area, but it's what I'll call a core habitat area. And are the 71 percent in that core area or elsewhere, or we don't know? I don't know. The fragmentation figures are roughly above, well, less than half in each state and less than half overall in both states is fragmented. And so the service looked to scientific literature on other similar species, but there's no best available science on this species for how big of a habitat patch they need. And so they looked by analogy to other species and said that that quantity of habitat has enough core areas in it that we're comfortable that even if the Texas plan only covers 70 percent, that there's still enough in both states overall to provide for the lizard's needs. And for that reason... And so back to your response to Judge Kavanaugh. So the point is that the service is defining endangered in terms of the need to list. And if everything's working just fine in New Mexico, it almost doesn't matter what happens in Texas. It's difficult to say on this record that it would be harmless error if the service had not relied properly on the Texas plan here. What the statute says is that the service is supposed to take into account the conservation efforts, any conservation efforts made by a state. So that's why it took account of both states' conservation efforts here. And I'm not aware that there's a finding, although at the outset of my argument I presented the context. I think it's important to keep in mind the context. Let me be clear, I'm not making a harmless error argument. I'm also not saying they couldn't reach the same result if they reanalyzed it, but I can't. We don't know. We don't know, exactly. That's the point. I just raised it because of the way you put it in your brief. Yes. All right. If there are no more questions. Thank you. How much time does Mr. Rylander have? Okay, why don't you take two minutes. I just need to point out a couple of things about this alleged permit. The permit that counsel cited at JA803 through 807 does not exist. That is because at letter N it states that it becomes effective upon the date the dune's lizard is listed as threatened or endangered. Outside of a section 10A1A permit, which applies only to listed species, the service has absolutely no enforcement authority over this Texas plan. It is now entirely in the hands of the Texas comptroller. The service can attempt to negotiate changes to the Certificates of Inclusion, but the individual landowners don't have to agree to anything. They can drop out if they want to conduct habitat modification. We don't even know what they've agreed to do, but assuming that they don't now agree to do what they said they were going to do, they don't have to take any further steps. So the only recourse for the service at this point is to go back and relist. But that's a significant recourse. It is a significant recourse. Texas has an incentive to avoid that because states prefer to do this on their own, so they have an incentive to do the steps that they've agreed to do, right? Again, substantively, the plan that is in place does not provide protections to the lizard. What we are going to have to go through is a listing process, which has already taken 28 years to get to a proposal. You know, it's sort of, a colleague of mine put it, sort of a treadmill to hell in that you have to keep going through the same process and the same process until we finally have some sort of a balance between something that either gives the service and the lizard adequate protections or the service can conclude on a different record because there's no phrase in the statutory standard. The first of extinction. Right. So that's, I don't know how you can make the statement you just made unless you're asking the court to assume that everybody acted in bad faith. We're not assuming that everyone is acting in bad faith, but we are saying that there are different types of voluntary agreements. There are those that are contractual. There are those that are incentive-based. There are some that could work. This particular one does not provide any high level of certainty to the service that protections are going to be in place, especially when more than 30% of the habitat was not enrolled at the time of listing, and that number has increased since then. The service has no recourse except to go back and start a listing process over again, which could take many years. And so on this record, based upon what the service, you know, knew at the time, it cannot be said, I don't think it passes the straight-faced test that this was certain to be implemented and certain to be effective in protecting the lizard. The actual reports. Of course, our standard here would be arbitrary and capricious. And you're close to saying this is just contrary to law. Well, there are two decision points. So the first one is under the peace analysis. The service's own standard is highly certain. So was it arbitrary and capricious for the service to conclude that these were highly certain? Right. And you cite a comment by one scientist, and the service points out, or the secretary points out that, you know, others had other views, for example. There are no other views in the record that I am aware of. There's repeated statements by staff scientists that indicate high levels of enrollment would be required. There are repeated statements by multiple people that say the secrecy provisions were a non-starter and that they don't have adequate information. And then there is a conclusion in the withdrawal decision suddenly that they do. But it's a predictive judgment that the service has to make, right, about effectiveness, looking at a variety of different factors coupled with a differential standard of review here. That's the problem that I have picking up on Judge Rogers' question. You've referred many times to certain to be effective. But certainty is some level of confidence, right? And effective, though, is an eye of the beholder kind of evaluation of many circumstances. And you're making a future prediction about that. It's very hard for us, it seems to me, to second-guess that. You've made good arguments in the first instance, but sitting here is not the expert on all this. It's hard for us to make a prediction. Well, the court does not need to defer to the service's wishful thinking. The court needs only to defer to scientific evidence and scientific conclusions in the record to the extent that they're not uncontroverted. As far as implementation is concerned, it's basic behavioral economics. It's not actually a scientific determination to which you need to give any particular weight. As for the effectiveness, I would simply read. You're hinging a lot on that incentive point, that they don't have an incentive. And I understand that. That's what I'd be doing too. Again, I think it was completely unreasonable for the service to include that enrollment would increase when, in fact, it hasn't. So when you look then at what the piece requires, the service's own standards that it set for itself, the requirement that there be biological responses and there be high levels of certainty, it didn't meet that. And then when you look at the effectiveness, again, you need to look at the Texas plan itself. And as the discussion this morning has kind of indicated, it's really difficult to understand what this plan actually does. It's not for lack of trying over the course of this litigation and a lot of time spent on this. The service only gets total averages within that map of each of those colored circles of the amount of habitat loss. It doesn't really know. And it went in great detail in the rule to show, you know, when it's trying to say that there is a lot of habitat or there is some habitat left for the lizard exactly where well pads are. It's not going to get that information under this. It's only going to get, well, in the green polygon, you know, there's been an acre of disturbance. But we don't know where or how or what impact that has had on fragmentation. So there's just too much the service doesn't know. And there are many, many other plans that states have developed for other species that are held to a higher standard. If the peace policy means anything and if the Endangered Species Act is to be harmonized, Section 4B1 and Section 4A1D and all of the factors are to be read in a way that makes sense and the service needs to be held to the standard that it's set for itself, that these plans have to mean something and they have to be able to rely on them. And if they don't have that high level of certainty, then that plan should be rejected. And if you have no further questions, that's my final point. Thank you.
judges: Henderson, Rogers, Kavanaugh